﻿Citation Nr: AXXXXXXXX
Decision Date: 09/26/19 Archive Date: 09/26/19

DOCKET NO. 181206-1448
DATE: September 26, 2019

ORDER

Readjudication of the claim for service connection for degenerative joint disease (DJD), left knee is warranted. 

Readjudication of the claim for service connection for a respiratory disability, to include sinusitis, to include as due to herbicide exposure, is warranted.

Service connection for urethral strictures and residuals of corrective surgery, to include as due to herbicide exposure, and as secondary to a prostate disorder, is denied.

Service connection for a right knee disability is denied.

Service connection for DJD, left knee is denied.

Service connection for a prostate disorder, to include as due to herbicide exposure is denied.

Service connection for diabetes mellitus type II (DM), to include as due to herbicide exposure, is denied.

Service connection for diabetic peripheral neuropathy, right lower extremity, to include as due to herbicide exposure, and as secondary to DM, is denied.

Service connection for diabetic peripheral neuropathy, left lower extremity, to include as due to herbicide exposure, and as secondary to DM, is denied.

Service connection for a bladder disorder, to include as due to herbicide exposure, is denied.

Service connection for coronary artery disease (CAD), to include as due to herbicide exposure, is denied

REMANDED

Entitlement to service connection for a respiratory disability, to include sinusitis.

FINDINGS OF FACT

1. The Veteran has not been exposed to herbicides during service.

2. New evidence was received after the May 2009 denial that is relevant to the issue of entitlement to service connection for DJD, left knee.

3. New evidence was received after the May 2009 denial that is relevant to the issue of entitlement to service connection for a respiratory disability, to include sinusitis, to include as due to herbicide exposure.

4. Urethral strictures and residuals of corrective surgery were not present in service or for years thereafter, and are not etiologically related to service, including herbicide exposure, or a service-connected disability.

5. A right knee disability was not present in service or for years thereafter and is not etiologically related to service.

6. A left knee disability was not present in service or for years thereafter and is not etiologically related to service.

7. A prostate disorder was not present in service or for years thereafter and is not etiologically related to service, including herbicide exposure.

8. DM was not present in service or within one year of service separation, and is not etiologically related to service, including herbicide exposure.

9. Diabetic peripheral neuropathy, right lower extremity was not present in service or within one year of service separation, and is not etiologically related to service, including herbicide exposure, or a service-connected disability.

10. Diabetic peripheral neuropathy left lower extremity was not present in service or within one year of service separation, and is not etiologically related to service, including herbicide exposure, or a service-connected disability.

11. A bladder disorder was not present in service or for years thereafter, and is not etiologically related to service, including herbicide exposure.

12. CAD was not present in service or within one year of service separation, and is not etiologically related to service, including herbicide exposure.

CONCLUSIONS OF LAW

1. The criteria for readjudicating the claim for service connection for DJD, left knee have been met. 84 Fed. Reg. 138, 169 (Jan. 18, 2019) (to be codified at 38 C.F.R. § 3.156(d)).

2. The criteria for readjudicating the claim for service connection for a respiratory disability, to include sinusitis, to include as due to herbicide exposure, have been met. 84 Fed. Reg. 138, 169 (Jan. 18, 2019) (to be codified at 38 C.F.R. § 3.156(d)).

3. Urethral strictures and residuals of corrective surgery were not incurred or aggravated during active duty, are not proximately due to, the result of, or aggravated by a service-connected disability, and their incurrence or aggravation during active duty may not be presumed. 38 U.S.C. §§ 1110, 1112, 1113, 1137, 5107 (2012); 38 C.F.R. §§ 3.303, 3.307, 3.309, 3.310 (2018). 

4. A right knee disability was not incurred or aggravated during active duty. 38 U.S.C. §§ 1110, 1112, 1113, 1137, 5107 (2012); 38 C.F.R. §§ 3.303, 3.309 (2018).

5. A left knee disability was not incurred or aggravated during active duty. 38 U.S.C. §§ 1110, 1112, 1113, 1137, 5107 (2012); 38 C.F.R. §§ 3.303, 3.309 (2018).

6. A prostate disorder was not incurred or aggravated during active duty, and its incurrence or aggravation during such service may not be presumed. 38 U.S.C. §§ 1110, 1112, 1113, 1137, 5107 (2012); 38 C.F.R. §§ 3.303, 3.307, 3.309 (2018).

7. DM was not incurred or aggravated during active duty, and its incurrence or aggravation during such service may not be presumed. 38 U.S.C. §§ 1110, 1112, 1113, 1137, 5107 (2012); 38 C.F.R. §§ 3.303, 3.307, 3.309 (2018).

8. Diabetic peripheral neuropathy, right lower extremity was not incurred or aggravated during active duty, or as a result of a service-connected disability, and its incurrence or aggravation during such service may not be presumed. 38 U.S.C. §§ 1110, 1112, 1113, 1137, 5107 (2012); 38 C.F.R. §§ 3.303, 3.307, 3.309, 3.310 (2018).

9. Diabetic peripheral neuropathy left lower extremity was not incurred or aggravated during active duty, or as a result of a service-connected disability, and its incurrence or aggravation during such service may not be presumed. 38 U.S.C. §§ 1110, 1112, 1113, 1137, 5107 (2012); 38 C.F.R. §§ 3.303, 3.307, 3.309, 3.310 (2018).

10. A bladder disorder was not incurred or aggravated during active duty, and its incurrence or aggravation during such service may not be presumed. 38 U.S.C. §§ 1110, 1112, 1113, 1137, 5107 (2012); 38 C.F.R. §§ 3.303, 3.307, 3.309 (2018).

11. CAD was not incurred or aggravated during active duty, and its incurrence or aggravation during such service may not be presumed. 38 U.S.C. §§ 1110, 1112, 1113, 1137, 5107 (2012); 38 C.F.R. §§ 3.303, 3.307, 3.309 (2018).

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The Veteran served on active duty from July 1971 to July 1991.

On August 23, 2017, the President signed into law the Veterans Appeals Improvement and Modernization Act, Pub. L. No. 115-55 (to be codified as amended in scattered sections of 38 U.S.C.), 131 Stat. 1105 (2017), also known as the Appeals Modernization Act (AMA). This law creates a new framework for Veterans dissatisfied with VA's decision on their claim to seek review. The Board of Veterans' Appeals (Board) is honoring the Veteran's choice to participate in VA's test program RAMP, the Rapid Appeals Modernization Program. See June 2018 RAMP election. 

In his June 2018 RAMP election, the Veteran selected the Higher-Level Review lane. In November 2018, the RO issued a Higher-Level Review RAMP rating decision. The Veteran timely appealed the November 2018 RAMP rating decision to the Board, selecting the Evidence Review lane. This lane allows for the submission of additional evidence within 90 days of the election to appeal to the Board. The Board has considered the evidence before the AOJ at the time of the June 2018 RAMP Higher-Level Review election, as well as any evidence received within 90 days of the December 2018 NOD.

The Board notes that in January 2019, the Board informed the Veteran that his appeal is on the Board hearing lane docket. This is incorrect, as the Veteran’s claim is in the Evidence Lane docket. The Veteran has not been prejudiced by the January 2019 letter.

In the November 2018 RAMP rating decision, the AOJ implicitly found that new and relevant evidence was submitted to warrant the readjudication of the Veteran's previously-denied claims for service connection for left knee DJD and sinusitis. The Board is bound by these favorable findings.

 

Service Connection

Service connection will be granted if the evidence demonstrates that a current disability resulted from an injury or disease incurred in or aggravated by active military service. 38 U.S.C. §§ 1110; 38 C.F.R. § 3.303 (a).

Establishing service connection generally requires (1) evidence of a current disability; (2) medical or, in certain circumstances, lay evidence of in-service incurrence or aggravation of a disease or injury; and (3) evidence of a nexus between the claimed in-service disease or injury and the present disability. Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004); see Caluza v. Brown, 7 Vet. App. 498, 506 (1995), aff'd per curiam, 78 F.3d 604 (Fed.Cir.1996) (table); see also Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004); Hickson v. West, 12 Vet. App. 247, 253 (1999); 38 C.F.R. § 3.303.

Under 38 C.F.R. § 3.303 (b), an alternative method of establishing the second and third Shedden/Caluza elements is through a demonstration of continuity of symptomatology. Barr v. Nicholson, 21 Vet. App. 303 (2007); see Clyburn v. West, 12 Vet. App. 296, 302 (1999). Continuity of symptomatology may be established if a claimant can demonstrate (1) that a disorder was "noted" during service; (2) evidence of post-service continuity of the same symptomatology; and (3) medical or, in certain circumstances, lay evidence of a nexus between the present disability and the post-service symptomatology. See Hickson, 12 Vet. App. at 253 (lay evidence of in-service incurrence sufficient in some circumstances for purposes of establishing service connection); 38 C.F.R. § 3.303 (b). The theory of continuity of symptomatology can be used only in cases involving those disorders explicitly recognized as chronic under 38 C.F.R. § 3.309 (a). See Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013).

In relevant part, 38 U.S.C. § 1154 (a) requires that VA give "due consideration" to "all pertinent medical and lay evidence" in evaluating a claim for disability or death benefits. Davidson v. Shinseki, 581 F.3d 1313 (Fed. Cir. 2009). The United States Court of Appeals for the Federal Circuit has held that "[l]ay evidence can be competent and sufficient to establish a diagnosis of a disorder when (1) a layperson is competent to identify the medical disorder, (2) the layperson is reporting a contemporaneous medical diagnosis, or (3) lay testimony describing symptoms at the time supports a later diagnosis by a medical professional." Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007); see also Buchanan v. Nicholson, 451 F.3d at 1337 ("[T]he Board cannot determine that lay evidence lacks credibility merely because it is unaccompanied by contemporaneous medical evidence").

"Symptoms, not treatment, are the essence of any evidence of continuity of symptomatology." Wilson v. Derwinski, 2 Vet. App. 16, 19 (1991). Once evidence is determined to be competent, the Board must then determine whether such evidence is also credible. See Layno, supra (distinguishing between competency ("a legal concept determining whether testimony may be heard and considered") and credibility ("a factual determination going to the probative value of the evidence to be made after the evidence has been admitted"). 

Service connection may be granted for any disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303 (d).

Where a veteran served for at least 90 days during a period of war or after December 31, 1946, and manifests certain chronic disabilities, including DM, arthritis and organic disease of the nervous system to a degree of at least 10 percent within one year from the date of termination of such service, such disease shall be presumed to have been incurred or aggravated in service, even though there is no evidence of such disease during the period of service. 38 U.S.C. §§ 1101, 1112, 1137; 38 C.F.R. §§ 3.307, 3.309.

VA regulations provide that certain diseases associated with exposure to herbicide agents may be presumed to have been incurred in service even if there is no evidence of the disease in service, provided the requirements of 38 C.F.R. § 3.307 (a)(6) are met. See 38 C.F.R. § 3.309 (e). The term "herbicide agent" means a chemical in an herbicide, including Agent Orange, used in support of the United States and allied military operations in the Republic of Vietnam during the Vietnam era. In addition, a veteran who, during active military, naval, or air service, served between April 1, 1968, and August 31, 1971, in a unit that, as determined by the Department of Defense, operated in or near the Korean DMZ, in an area in which herbicides are known to have been applied during that period, shall be presumed to have been exposed during such serve to an herbicide agent, unless there is affirmative evidence to establish that a veteran was not exposed to any such agent during that service. See also 38 C.F.R. § 3.814(c)(2). 38 C.F.R. § 3.307 (a)(6)(iv). In order to benefit from the presumption of service connection for diseases associated with herbicide exposure, a veteran must have one of the diseases enumerated in § 3.309(e), including DM and peripheral neuropathy.

When a veteran is found not to be entitled to a regulatory presumption of service connection for a given disability, the claim must nevertheless be reviewed to determine whether service connection can be established on another basis. See Combee v. Brown, 34 F.3d 1039, 1043-44 (Fed. Cir. 1994).

Service connection may also be granted for disability that is proximately due to or the result of a service-connected disability. See 38 C.F.R. § 3.310 (a). When service connection is thus established for a secondary disorder, the secondary disorder shall be considered a part of the original disorder. See 38 C.F.R. § 3.310 (a); Harder v. Brown, 5 Vet. App. 183, 187 (1993).

The controlling regulation has been interpreted to permit a grant of service connection not only for disability caused by a service-connected disability, but for the degree of disability resulting from aggravation of a nonservice-connected disability by a service-connected disability. See Allen v. Brown, 7 Vet. App. 439, 448 (1995).

Except as otherwise provided by law, a claimant has the responsibility to present and support a claim for benefits under laws administered by the Secretary. The Secretary shall consider all information and lay and medical evidence of record in a case before the Secretary with respect to benefits under laws administered by the Secretary.

When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of the matter, the Secretary shall give the benefit of the doubt to the claimant. 38 U.S.C. § § 5107 (2012); 38 C.F.R. § 3.102 (2018); see also Gilbert v. Derwinski, 1 Vet. App. 49, 53 (1990). To deny a claim on its merits, the evidence must preponderate against the claim. Alemany v. Brown, 9 Vet. App. 518, 519 (1996), citing Gilbert, 1 Vet. App. At 54.

1. Service connection for urethral strictures and residuals of corrective surgery, to include as due to herbicide exposure, and as secondary to prostate disorder

The Veteran contends that his currently diagnosed urethral strictures and residuals of corrective surgery is related to his active military service, to include herbicide exposure during active duty in Thailand. Specifically, he claims that while stationed at U-Tapao Air Force Base from December 1973 to December 1974, he was assigned to the 307th Organizational Maintenance Squadron (Strategic Air Command) as an Aircraft Maintenance Specialist. According to the Veteran, his duties were primarily on the flight line, but his work at the ends of the flight line (aircraft over-run) and the B-52 ramps required him to work in close proximity to the base perimeter on a regular basis. See November 2017 statement in support of claim and June 2018 notice of disagreement. 

The Veteran's personnel records show that he was stationed at U-Tapao Air Field Base from November 1973 to November 1974. He served as an Aircraft Maintenance Specialist.

The record shows the RO has attempted to obtain verification of herbicide exposure in Thailand. It was determined that the VA lacks the information the U.S. Army and Joint Services Records Research Center (JSRRC) requires to verify herbicide exposure in Thailand. Specifically, in a Formal Finding from the VA, it was noted that the Veteran served as an aircraft maintenance mechanic while stationed in Thailand, and thorough screening of personnel records show no primary or additional duties that would factually place the Veteran on or about the perimeter. See May 2018 Rating Decision/Administrative Decision/Formal Finding/Statement of the Case/Supplemental Statement of the Case.

The Veteran claims that 13 months after his return from active duty in Thailand, he had a daughter who was born with spina bifida and this proves that he was exposed to Agent Orange in Thailand. See December 2018 statement in support of claim. The development of Spina Bifida, however, is not exclusive to herbicide exposure, and the mere development of a disease that has some association with herbicide exposure does not establish the fact of exposure.

The Veteran has not presented any other evidence to indicate that he was exposed to herbicides during active duty in Thailand. Unfortunately, his assertions, without more, simply do not support the claim that he was, in fact, actually exposed to herbicides in service. The Board finds that his duties in service were not such as to suggest placement near the air base perimeter. Thus, a basis for favorable action due to in-service herbicide exposure is not presented.

The appellant could, nonetheless, establish service connection with evidence of direct incurrence. Stefl v. Nicholson, 21 Vet. App. 120 (2007); see Combee v. Brown, 34 F.3d 1039 (Fed. Cir. 1994).

The Veteran was not diagnosed with urethral strictures for many years after service, and there is no competent evidence to establish that his urethral strictures were due to any event or incident of the Veteran's period of active duty.

Service treatment records do not show a diagnosis, treatment or complaints related to urethral strictures or any other urethral problems during active duty or at discharge. 

Post-service treatment records show the Veteran was diagnosed with urethral stricture disease many years after his discharge, with resultant corrective surgery in 2012. The post-service treatment records do not indicate that the Veteran's urethral stricture disease or any residuals from corrective surgery were related to his active military service, and there is no evidence otherwise linking the current disability or any residuals from corrective surgery to service. As previously noted, there was no herbicide exposure in service.

With regard to the years-long evidentiary gap in this case between active service and the earliest manifestations of urethral problems, the Board notes that this passage of time weighs significantly against a finding of direct service connection for urethral strictures and residuals of corrective surgery. See Maxson v. Gober, 230 F.3d 1330, 1333 (Fed. Cir. 2000).

The Veteran also contends that his currently diagnosed urethral strictures and residuals of corrective surgery is directly related to his currently diagnosed prostate disorder, which he believes is related to his active military service. See November 2017 claim. However, as discussed further below, service connection is not warranted for a prostate disorder. As such, secondary service connection for urethral strictures and residuals of corrective surgery is not warranted. See 38 C.F.R. § 3.310 (2018).

The Board acknowledges the Veteran's assertion that his urethral strictures and residuals of corrective surgery are due to active military service, including herbicide exposure in service. However, while the Veteran is competent to report the observable symptoms of a disability, and in certain situations a lay person may be competent to establish the etiology of a disability; in the present case, the Veteran is not competent to provide a nexus between his currently diagnosed urethral strictures and residuals of corrective surgery and his active service. Such an opinion would require medical expertise as it would require clinical testing and interpretation of clinical findings as well as assessing the relevance of any noted symptomatology. This is particularly true where, as here, there is no reference to the disorder in service or for many years later. Thus, the Board finds that the Veteran, as a layperson, is not qualified to render an opinion concerning the cause of his urethral strictures and residuals of corrective surgery. 38 C.F.R. § 3.159 (a)(1), (2) (2018).

For the reasons and basis stated above, the Board finds that service connection for urethral strictures and residuals of corrective surgery, on a direct or presumptive basis, is not warranted. In reaching this decision, the Board has considered the benefit-of-the-doubt doctrine; however, as the preponderance of the evidence is the against the claim, that doctrine is not applicable.

2. Service connection for a right knee disability

Service treatment records do not show a diagnosis, treatment or complaints related to the right knee during active duty or at discharge. 

Post-service treatment records show that the Veteran has been diagnosed with and treated for a right knee disorder, and that he underwent a right knee arthroscopy in 2014. The February 2018 VA examiner also noted that the Veteran had been diagnosed with DJD of the right knee. The post-service treatment records do not indicate that the Veteran's right knee disability is related to his active military service, and there is no evidence otherwise linking the current disability to service.

With regard to the years-long evidentiary gap in this case between active service and the earliest manifestations of right knee problems, the Board notes that this passage of time weighs significantly against a finding of direct service connection for a right knee disability. See Maxson v. Gober, 230 F.3d 1330, 1333 (Fed. Cir. 2000).

The presumption of service connection for chronic diseases diagnosed within one year following discharge from active duty is also not applicable to this case because the evidence demonstrates that arthritis of the right knee (DJD) was initially shown more than one year after the Veteran's discharge from service.

The Board acknowledges the Veteran's assertion that his right knee disability is due to active military service. However, while the Veteran is competent to report the observable symptoms of a disability, and in certain situations a lay person may be competent to establish the etiology of a disability; in the present case, the Veteran is not competent to provide a nexus between his currently diagnosed right knee disability and his active service. Such an opinion would require medical expertise as it would require clinical testing and interpretation of clinical findings as well as assessing the relevance of any noted symptomatology. Thus, the Board finds that the Veteran, as a layperson, is not qualified to render an opinion concerning the cause of his right knee disability. 38 C.F.R. § 3.159 (a)(1), (2) (2018).

Although the February 2018 VA examiner did not address the etiology of the right knee, given the absence of any credible account of symptoms or complaints in service or in the decades-long gap between service and the first notation of right knee symptoms, the VA examiner would have no basis, other than to accept the Veteran’s own account of symptoms in service or thereafter, on which to base such an opinion. As the Board does not find the Veteran’s account of right knee symptoms since service to be credible, the Board finds that another examination is not necessary.

For the reasons and basis stated above, the Board finds that service connection for a right knee disability is not warranted. In reaching this decision, the Board has considered benefit-of-the-doubt doctrine; however, as the preponderance of the evidence is against the claim, that doctrine is not applicable.

3. Service connection for degenerative joint disease (DJD), left knee, claimed as a left knee disorder

Service treatment records show the Veteran was seen in April 1985 on three occasions. Diagnosis was acute left medial collateral ligament strain. The note on April 4, 1985 states that strain was resolving. Note on April 16, 1985 states resolving internal derangement, knee is no longer painful. He was also seen in July 1985 after softball, when he fell on his knee. At that time, there was no knee-joint pain, but he sustained and was treated for abrasion of the knee. Other than notes in April 1985, there were no other complaints of left knee pain in the service treatment records. The Veteran also reported that he was hit by a ball in the 1980s, and afterward, he developed some pain in his knee. 

The post-service treatment records show that the Veteran has been diagnosed with and treated for a left knee disorder. He was also diagnosed with left knee DJD on VA examination in April 2009. The post-service treatment records do not indicate that the Veteran’s left knee disability is related to his active military service, and there is no other evidence otherwise linking the current disability to service. 

With regard to the years-long evidentiary gap in this case between active service and the earliest manifestations of left knee problems, the Board notes that this passage of time weighs significantly against a finding of direct service connection for a left knee disability. See Maxson v. Gober, 230 F.3d 1330, 1333 (Fed. Cir. 2000).

The presumption of service connection for chronic diseases diagnosed within one year following discharge from active duty is also not applicable to this case because the evidence demonstrates that arthritis of the left knee (DJD) was initially shown more than one year after the Veteran's discharge from service.

The Board acknowledges the Veteran's assertion that his left knee disability is due to active military service. However, while the Veteran is competent to report the observable symptoms of a disability, and in certain situations a lay person may be competent to establish the etiology of a disability; in the present case, the Veteran is not competent to provide a nexus between his currently diagnosed left knee disability and his active service. Such an opinion would require medical expertise as it would require clinical testing and interpretation of clinical findings as well as assessing the relevance of any noted symptomatology. Thus, the Board finds that the Veteran, as a layperson, is not qualified to render an opinion concerning the cause of his left knee disability. 38 C.F.R. § 3.159 (a)(1), (2) (2018).

Although the April 2009 VA examiner did not give a rationale for his opinion that the Veteran’s current left knee disability was not related to his knee injuries in service, given that the left knee symptoms in service resolved prior to the Veteran’s discharge and the decades-long gap between service and the first notation of left knee symptoms, the Board does not find the Veteran’s account of left knee symptoms since service to be credible. As such, the Board finds the April 2009 VA examiner’s opinion is supported, and another examination is not necessary.

For the reasons and basis stated above, the Board finds that service connection for a left knee disability is not warranted. In reaching this decision, the Board has considered benefit-of-the-doubt doctrine; however, as the preponderance of the evidence is against the claim, that doctrine is not applicable.

4. Service connection for a prostate disorder, to include as due to herbicide exposure

The Veteran contends that his currently diagnosed prostate disorder is related to his active military service, to include herbicide exposure during active duty in Thailand. 

As noted previously, the RO determined that the Veteran served as an aircraft maintenance mechanic while stationed in Thailand, and thorough screening of personnel records show no primary or additional duties that would factually place the Veteran on or about the perimeter. See May 2018 Rating Decision/Administrative Decision/Formal Finding/Statement of the Case/Supplemental Statement of the Case. The Board also notes that the Veteran’s service duties would not be expected to involve proximity to the base perimeter, and that there is otherwise no persuasive evidence establishing that the Veteran was exposed to herbicides in service.

Thus, a basis for favorable action due to in-service herbicide exposure is not presented. The Board notes, in any event, that the Veteran’s prostate disorder is not one of the diseases subject to presumptive service connection.

As for service connection with evidence of direct incurrence, service treatment records do not show a diagnosis, treatment or complaints related to a prostate disorder during active duty or at discharge. 

Post-service treatment records show that the Veteran has been diagnosed with benign localized hyperplasia of the prostate, many years after his discharge. The post-service treatment records do not indicate that the Veteran's prostate disorder is related to his active military service, and there is no evidence otherwise linking the current prostate disorder to service, including herbicide exposure.

With regard to the years-long evidentiary gap in this case between active service and the earliest manifestations of prostate problems, the Board notes that this passage of time weighs significantly against a finding of direct service connection for a prostate disorder. See Maxson v. Gober, 230 F.3d 1330, 1333 (Fed. Cir. 2000).

The Board acknowledges the Veteran's assertion that his prostate disorder is due to active military service, particularly herbicide exposure in service. However, while the Veteran is competent to report the observable symptoms of a disability, and in certain situations a lay person may be competent to establish the etiology of a disability; in the present case, the Veteran is not competent to provide a nexus between his currently diagnosed prostate disorder and his active service. Such an opinion would require medical expertise as it would require clinical testing and interpretation of clinical findings as well as assessing the relevance of any noted symptomatology. This is particularly true where, as here, the claim is based on herbicide exposure when no such exposure has been established. Thus, the Board finds that the Veteran, as a layperson, is not qualified to render an opinion concerning the cause of his prostate disorder. 38 C.F.R. § 3.159 (a)(1), (2) (2018).

For the reasons and basis stated above, the Board finds that service connection for a prostate disorder, on a direct or presumptive basis, is not warranted. In reaching this decision, the Board has considered benefit-of-the-doubt doctrine; however, as the preponderance of the evidence is the against the claim, that doctrine is not applicable.

5. Service connection for diabetes mellitus type II (DM), to include as due to herbicide exposure

The Veteran contends that his currently diagnosed DM is related to his active military service, to include herbicide exposure during active duty in Thailand.

As already discussed, the Veteran was not exposed to herbicides in service. As such, presumptive service connection on the basis of exposure to herbicides is not warranted. 

Service treatment records do not show a diagnosis, treatment or complaints related to DM during active duty or at discharge. 

Post-service treatment records show the Veteran was initially diagnosed with DM in 2017, many years after his discharge, and that he is currently treated for his DM with medication. The post-service treatment records do not indicate that the Veteran's DM is related to his active military service, and there is no evidence otherwise linking the current DM to service. In this regard, the Veteran was afforded a VA examination in February 2018, to evaluate his DM. He was diagnosed with DM, but the examiner did not offer an opinion on the etiology of the disease. Given that the Veteran’s claim is actually based on exposure to herbicides, an opinion was not necessary.

With regard to the years-long evidentiary gap in this case between active service and the earliest manifestations of DM, the Board notes that this passage of time weighs significantly against a finding of direct service connection for DM. See Maxson v. Gober, 230 F.3d 1330, 1333 (Fed. Cir. 2000).

The presumption of service connection for chronic diseases diagnosed within one year following discharge from active duty is also not applicable to this case because the evidence demonstrates that DM was initially shown more than one year after the Veteran's discharge from service.

The Board acknowledges the Veteran's assertion that his DM is due to active military service, including herbicide exposure. However, while the Veteran is competent to report the observable symptoms of a disability, and in certain situations a lay person may be competent to establish the etiology of a disability; in the present case, the Veteran is not competent to provide a nexus between his currently diagnosed DM and his active service. Such an opinion would require medical expertise as it would require clinical testing and interpretation of clinical findings as well as assessing the relevance of any noted symptomatology. Again, the predicate for the Veteran’s claim, namely exposure to herbicides, has not been established. Thus, the Board finds that the Veteran, as a layperson, is not qualified to render an opinion concerning the cause of his DM. 38 C.F.R. § 3.159 (a)(1), (2) (2018).

For the reasons and basis stated above, the Board finds that service connection for DM, on a direct or presumptive basis, is not warranted. In reaching this decision, the Board has considered benefit-of-the-doubt doctrine; however, as the preponderance of the evidence is the against the claim, that doctrine is not applicable.

6. Service connection for diabetic peripheral neuropathy, right lower extremity, to include as due to herbicide exposure, and as secondary to DM

7. Service connection for diabetic peripheral neuropathy, left lower extremity, to include as due to herbicide exposure, and as secondary to DM

The Veteran contends that he has currently demonstrated diabetic peripheral neuropathy of the right and left lower extremities, related to his active military service, to include exposure to herbicides during active duty in Thailand, and as secondary to DM, which he claims is related to his active military service.

The Board again notes, as discussed in detail earlier, that the Veteran was not exposed to herbicides and so presumptive service connection on that basis is not warranted. The Board also points out that service connection for DM is not warranted.

Service treatment records do not show a diagnosis, treatment or complaints related to peripheral neuropathy or any other neurological disorder of the lower extremities during active duty or at discharge. 

Post-service treatment records note a past medical history of peripheral neuropathy, acute and subacute, and show complaints of bilateral lower extremity peripheral neuropathy, related to his endocrine disease. The post-service treatment records do not indicate that the Veteran's peripheral neuropathy of the lower extremities is related to his active military service, and there is no evidence otherwise linking any current peripheral neuropathy of the lower extremities to service. The February 2018 VA examiner noted that the Veteran did not have any complications, conditions, signs or symptoms related to his DM.

With regard to the years-long evidentiary gap in this case between active service and the earliest manifestations of peripheral neuropathy of the lower extremities, the Board notes that this passage of time weighs significantly against a finding of direct service connection for peripheral neuropathy of the lower extremities. See Maxson v. Gober, 230 F.3d 1330, 1333 (Fed. Cir. 2000).

The presumption of service connection for chronic diseases diagnosed within one year following discharge from active duty is also not applicable to this case because the evidence demonstrates that peripheral neuropathy of the lower extremities was initially shown more than one year after the Veteran's discharge from service.

The Veteran also contends that his currently diagnosed peripheral neuropathy of the lower extremities is directly related to his currently diagnosed DM, which he believes is related to his active military service. See February 2018 claim. However, the Board notes that, as discussed above, service connection is denied herein for DM. As such, secondary service connection for peripheral neuropathy of the lower extremities is not warranted. See 38 C.F.R. § 3.310 (2018).

The Board acknowledges the Veteran's assertion that his peripheral neuropathy of the lower extremities is due to active military service, including herbicide exposure. However, while the Veteran is competent to report the observable symptoms of a disability, and in certain situations a lay person may be competent to establish the etiology of a disability; in the present case, the Veteran is not competent to provide a nexus between his currently diagnosed peripheral neuropathy of the lower extremities and his active service. Such an opinion would require medical expertise as it would require clinical testing and interpretation of clinical findings as well as assessing the relevance of any noted symptomatology. This is especially true here, given that there was no exposure to herbicides. Thus, the Board finds that the Veteran, as a layperson, is not qualified to render an opinion concerning the cause of his peripheral neuropathy of the lower extremities. 38 C.F.R. § 3.159 (a)(1), (2) (2018).

For the reasons and basis stated above, the Board finds that service connection for peripheral neuropathy of the lower extremities, on a direct or presumptive basis, is not warranted. In reaching this decision, the Board has considered benefit-of-the-doubt doctrine; however, as the preponderance of the evidence is the against the claim, that doctrine is not applicable.

8. Service connection for a bladder disorder, to include as due to herbicide exposure

The Veteran contends that his currently diagnosed bladder disorder is related to his active military service, to include herbicide exposure during active duty in Thailand.

As discussed previously, the Veteran was not exposed to herbicides and so presumptive service connection on that basis is not warranted. In any event, the Veteran’s bladder disorder is not one of the diseases subject to presumptive service connection.

The Veteran was not diagnosed with a bladder disorder for many years after service, and there is no competent evidence to establish that his bladder disorder is due to any event or incident of the Veteran's period of active duty.

Service treatment records do not show a diagnosis, treatment or complaints related to bladder problems during active duty or at discharge. 

Post-service treatment records show the Veteran has been diagnosed with a cystoscopic bladder many years after his discharge. The post-service treatment records do not indicate that the Veteran's bladder disorder is related to his active military service, and there is no evidence otherwise linking the current bladder disorder to service, including herbicide exposure.

With regard to the years-long evidentiary gap in this case between active service and the earliest manifestations of bladder problems, the Board notes that this passage of time weighs significantly against a finding of direct service connection for a bladder disorder. See Maxson v. Gober, 230 F.3d 1330, 1333 (Fed. Cir. 2000).

The Board acknowledges the Veteran's assertion that his bladder disorder is due to active military service, including herbicide exposure. However, while the Veteran is competent to report the observable symptoms of a disability, and in certain situations a lay person may be competent to establish the etiology of a disability; in the present case, the Veteran is not competent to provide a nexus between his currently diagnosed bladder disorder and his active service. Such an opinion would require medical expertise as it would require clinical testing and interpretation of clinical findings as well as assessing the relevance of any noted symptomatology. This is particularly true here, as the Veteran’s claim is based on the predicate of herbicide exposure. Thus, the Board finds that the Veteran, as a layperson, is not qualified to render an opinion concerning the cause of his bladder disorder. 38 C.F.R. § 3.159 (a)(1), (2) (2018).

For the reasons and basis stated above, the Board finds that service connection for a bladder disorder, on a direct or presumptive basis, is not warranted. In reaching this decision, the Board has considered benefit-of-the-doubt doctrine; however, as the preponderance of the evidence is the against the claim, that doctrine is not applicable.

9. Service connection for CAD, to include as due to herbicide exposure

The Veteran contends that his currently diagnosed CAD is related to his active military service, to include herbicide exposure during active duty in Thailand.

As already discussed, the Veteran was not exposed to herbicides in service. As such, presumptive service connection on the basis of exposure to herbicides is not warranted. 

The Veteran was not diagnosed with CAD or any other heart disability for many years after service, and there is no competent evidence to establish that his currently diagnosed CAD is due to any event or incident of the Veteran's period of active duty.

Service treatment records do not show a diagnosis, treatment or complaints related to CAD or any other heart disorder during active duty or at discharge. 

Post-service treatment records show the Veteran was initially diagnosed with CAD in 2010, many years after his discharge. The post-service treatment records do not indicate that the Veteran's CAD is related to his active military service. An April 2018 VA examiner opined that the Veteran’s diagnosed CAD was at least as likely as not incurred in or caused by the claimed in-service injury, event, or illness. The only rationale given for the opinion was that the Veteran was diagnosed with CAD on the February 2018 examination and during a VA office visit. However, given that the Veteran’s claim is actually based on exposure to herbicides, and as noted above, the Veteran was not exposed to herbicides in service, the Board finds that there is no basis for the opinion, and it is therefore, inadequate for evaluation purposes. There is no other competent evidence otherwise linking the current CAD to service, including herbicide exposure.

With regard to the years-long evidentiary gap in this case between active service and the earliest manifestations of CAD, the Board notes that this passage of time weighs significantly against a finding of direct service connection for CAD. See Maxson v. Gober, 230 F.3d 1330, 1333 (Fed. Cir. 2000).

 

The presumption of service connection for chronic diseases diagnosed within one year following discharge from active duty is also not applicable to this case because the evidence demonstrates that CAD was initially shown more than one year after the Veteran's discharge from service.

The Board acknowledges the Veteran's assertion that his CAD is due to active military service, including herbicide exposure. However, while the Veteran is competent to report the observable symptoms of a disability, and in certain situations a lay person may be competent to establish the etiology of a disability; in the present case, the Veteran is not competent to provide a nexus between his currently diagnosed CAD and his active service. Such an opinion would require medical expertise as it would require clinical testing and interpretation of clinical findings as well as assessing the relevance of any noted symptomatology. Again, the predicate for the Veteran’s claim, namely exposure to herbicides, has not been established. Thus, the Board finds that the Veteran, as a layperson, is not qualified to render an opinion concerning the cause of his CAD. 38 C.F.R. § 3.159 (a)(1), (2) (2018).

For the reasons and basis stated above, the Board finds that service connection for CAD, on a direct or presumptive basis, is not warranted. In reaching this decision, the Board has considered benefit-of-the-doubt doctrine; however, as the preponderance of the evidence is the against the claim, that doctrine is not applicable.

REASONS FOR REMAND

10. Entitlement to service connection for a respiratory disability to include sinusitis.

Service treatment records show treatment on several occasions for nasal and sinus congestion and diagnoses ranging from acute to chronic sinusitis. Deployment examination in May 1991 notes a history of acute sinusitis, treated with oral medications, mostly seasonal, such as winter time. 

On VA examination in April 2009, the Veteran reported that he had undergone surgery on the left nasal passage in February 2009, which helped. The examiner concluded that there were no objective findings of sinusitis and did not offer an opinion on the etiology of the claimed disorder. 

However, current VA treatment records show that the Veteran has been diagnosed with chronic sinusitis, as well as chronic sinus rhinosinusitis and chronic rhinitis. The Board notes that although the Veteran has claimed service connection for sinusitis, the claim should be construed as a claim for service connection for a respiratory disability, to include sinusitis. See Clemons v. Shinseki, 23 Vet. App. 1, 5 (2009). There is no medical opinion of record addressing the etiology the currently diagnosed respiratory disability. As such, the Board finds that a remand for a VA examination and opinion to determine the etiology of any current respiratory disability, including sinusitis, is necessary.

The matter is REMANDED for the following action:

1. Updated treatment records should be obtained and added to the claims file/e-folder.

2. Following completion of the above, afford the Veteran an appropriate VA examination to determine the nature and etiology of any currently diagnosed respiratory disability, including sinusitis. The claims folder, including a copy of this remand, should be made available to the examiner for review in connection with the examination and the examiner should acknowledge such review in the examination report or in an addendum.

The examiner should provide an opinion as to whether it is at least as likely as not (50 percent probability or more) that any current respiratory disability, including sinusitis, originated while the Veteran was serving on active duty or is otherwise related to a disease or injury in service.

A complete rationale should be given for all opinions and conclusions expressed. 

The examiner is advised that the Veteran is competent to report injuries and symptoms, and that his reports must be considered in formulating the requested opinion. If his reports are discounted, the examiner should provide a reason for doing so. 

The examiner is also advised that the absence of evidence in the service treatment records is an insufficient basis, by itself, for a negative opinion.

If the examiner cannot provide an opinion without resort to speculation, the examiner should provide an explanation as to why this is so and note what, if any, additional evidence would permit such an opinion to be made.

3. After completion of the above and any other development deemed necessary, readjudicate the Veteran's remaining claim for service connection based on the new evidence of record. If the claim is denied, the Veteran and his representative should be issued a supplemental statement of the case and provided an opportunity to respond. The case should then be returned to the Board for further appellate consideration, if otherwise in order.

 

 

KELLI A. KORDICH

Veterans Law Judge

Board of Veterans’ Appeals

Attorney for the Board F. Yankey, Counsel

The Board’s decision in this case is binding only with respect to the instant matter decided. This decision is not precedential, and does not establish VA policies or interpretations of general applicability. 38 C.F.R. § 20.1303.